### Case No. 8,980.

MAITLAND et al. v. The ATLANTIC.

[Newb. 514; [1] 3 Am. Law Reg. 477.]

District Court, E. D. Louisiana. May, 1855.

BOTTOMRY—MORTGAGE—LIEN—SIMPLE LOAN—
BILL TAKEN WITH BOND.

1. Where A., the master of a brig, puts into a foreign port by reason of a leak, and there bor-

---

[1] [Reported by John S. Newberry, Esq.]

rows money from B., and draws a bill of exchange upon C., which bill is unpaid at maturity, and at the same time that the bill is drawn, he also executes a mortgage or hypothecation. in which there is a special stipulation that B. is not to take the usual marine risks in cases of bottomry and hypothecation. neither instrument establishes a lien upon the brig, which can be enforced in the admiralty, for want of jurisdiction.

[Cited in The J. R. Hoyle. Case No. 7,557; The Edward Albro, Id. 4,290.]

2. The essential difference between a bottomry bond and a simple loan is, that on the latter, the money is at the risk of the borrower, and must be paid at all events: in the former, it is at the risk of the lender during the voyage, and the right to demand payment depends on the safe arrival of the vessel.

[Cited in The Edward Albro, Case No. 4,290.]

3. Admiralty cannot enforce a claim for money which has been advanced on the personal credit of the vessel, owner or master, in a suit in rem.

[Cited in The J. R. Hoyle, Case No. 7,557.]

4. Where a bill is drawn, and a bottomry bond taken for the same sum, the bill must share the fate of the bond.

[This was a libel in rem by R. L. Maitland & Co. against the brig Atlantic, to enforce the payment of money advanced upon the hypothecation of the vessel. The case is heard upon an exception to the jurisdiction of the court.]

Mr. Semmes. for libelants.
Mr. Gaither, for respondent.

McCALEB, District Judge. The libel in this case alleges that prior to the 12th of December, 1853, the brig Atlantic, while on a voyage from Philadelphia to New Orleans, with a cargo of coal, sprung a leak, and went into the port of Key West for repairs, to enable her to complete her voyage. That the master, Henry C. King, being a stranger in Key West, and being in want of money to pay for the necessary repairs, and having no other means of procuring the same, borrowed of the commercial firm of H. H. Wall & Co., at Key West, the sum of eight hundred and thirteen dollars and twenty-one cents, upon the hypothecation and mortgage of the brig, her cargo and freight. It is further alleged that, in consideration of the said advance, the master drew his draft or bill of exchange for the sum of eight hundred and sixty-two dollars, which sum included the loan for repairs, and six per cent. thereon for interest and commission. The draft was drawn upon Henry Simpson & Co.. of Philadelphia, payable one day after sight; and in order to secure the payment thereof, the master by a certain instrument of writing, dated 12th December, 1853, and executed before a notary public at Key West, hypothecated and mortgaged the brig, her cargo, freight, apparel and furniture, unto the said Wall & Co. The draft was duly assigned by Wall & Co. to the libelants, who, after due diligence, not being able to find the drawees, caused it to be protested for non-acceptance and non-payment, and gave notice thereof to the drawer. This action is now instituted to hold the brig liable for the payment of the amount of the draft. Both the draft and instrument of hypothecation and mortgage are annexed to the libel as part thereof. The latter, after the usual terms of hypothecation and pledge, concludes with the following stipulation: "It is expressly understood and agreed, that the said Wall & Co. do not take upon themselves the marine risks usual in cases of bottomry and hypothecation." To the libel an exception had been filed by the claimants, to the effect that this court, as a court of admiralty, has no jurisdiction to enforce the payment of the sum demanded. It is evident that an extravagant rate of interest has been exacted by the house of Wall & Co., and it is this fact, coupled with the stipulation in the instrument of hypothecation, to which reference has just been made, which forms the basis of this exception. Although the lender of the money seems to have intended to secure the payment of the draft, by exacting both a mortgage on the ship, and a pledge of the merchandise laden on board also, the instrument cannot be properly regarded either as a bottomry bond or as a security in the nature of respondentia. That the master had a right, in this instance, in a port of a state other than that of the residence of the owner, to raise money for the payment of the necessary repairs done upon the brig, by pledging the ship, cannot be denied. And if the court could regard the instrument before it in the light of a bottomry bond, with the usual stipulations, it would feel itself compelled to exercise jurisdiction to grant the party relief. There would be a clear and well established lien upon the vessel, which, according to the principles of the maritime law, could be enforced in the admiralty.

Contracts of bottomry are so called, because the bottom or keel of the vessel is figuratively used to express the whole body thereof; sometimes, also, but inaccurately, money lent in this manner is said to run at respondentia—for that word properly applies to the loan of money upon merchandise laden on board a ship, the repayment whereof is made to depend upon the safe arrival of the merchandise at the destined port. In like manner, the repayment of money lent on bottomry does in general depend upon the prosperous conclusion of the voyage; and as the lender sustains the hazard of the voyage, he receives, upon its happy termination, a greater price or premium for his money than the rate of interest allowed by law in ordinary cases. The premium paid on these occasions depends wholly on the contract of the parties, and consequently varies according to the nature of the adventure. Abb. Shipp.. 150, 151. The high rate of interest exacted by the lenders in this case, would, therefore, be no valid objection to the libelants' recovery, if it appeared from the act of hypothecation that the usual maritime risks

had been incurred; but, so far from this being the case, the clause in the act of hypothecation, to which reference has been made, expressly declares that no such risk was to be assumed. The essential difference between a bottomry bond and a simple loan is, that in the latter the money is at the risk of the borrower, and must be paid at all events; in the former, it is at the risk of the lender during the voyage, and the right to demand payment depends on the safe arrival of the vessel. And if the lender of money on a bottomry or respondentia bond be willing to stake the money upon the safe arrival of the ship or cargo, and to take upon himself, like an insurer, the risk of sea perils, it is lawful, reasonable and just, that he should be authorized to demand and receive an extraordinary interest, to be agreed on, and which the lender shall deem commensurate to the hazard he runs. But a bond executed as an hypothecation, but not upon the principles which govern such securities, is not a bottomry bond, capable of being enforced in a court of admiralty, but must be proceeded on as at common law. It is absolutely necessary that the liability of the lender to the sea risks should appear or be fairly collected from the instrument; otherwise, the reservation of maritime interest will render the security void on the ground of usury, not only as a charge upon the ship, but also against the person of the borrower. And where an instrument, called a bottomry bond, contained an express clause that the sum secured should be paid within thirty days after intelligence of the loss, Lord Stowell doubted his jurisdiction to entertain the suit at all, and dismissed it on the ground that the very essence of bottomry, which alone could give jurisdiction to the admiralty, was wanting. From this sentence an appeal was prosecuted to the delegates, and that court, after directing a search for precedents, decided that as the maritime interest was reserved, and maritime risk was excluded from the bond, it was void. 1 Hagg. Adm. 55; 2 Hagg. Adm. 57.

It is contended by the proctor for the libelants, that the hypothecation in this case, though bad in part, may, by a court of admiralty, be regarded as good in part, and as such, still be considered as a legitimate contract for the exercise of its jurisdiction. If, by assuming this position, the proctor would maintain that the clause in the hypothecation by which the libelants refused to assume maritime risks, may be rejected by the court, and the instrument be enforced as a valid hypothecation independently of this clause, he is widely mistaken. As the parties have chosen to bind themselves, so shall they be bound, and the court has no authority whatever to vary the stipulations of their contract, simply for the purpose of administering equitable relief, as a court of admiralty. It is perfectly true that a bottomry bond may be bad in part and good in part,

and that as to the good, it is competent for a court of admiralty to exercise jurisdiction to grant relief. But I apprehend that this well recognized principle was never applied to a case like the present. It has sometimes happened that advances have been made for repairs in foreign ports, partly upon the personal credit of the owners, and partly upon the credit or security of the ship; and the whole amount of advances so made, has been included in one bottomry bond. In such cases, it has been uniformly held that as to the particular sum advanced on the personal credit of the owners, the bond was bad; but as to the sum advanced on the security of the vessel, it was good, and that as to the latter amount, a court of admiralty would exercise jurisdiction to enforce its payment. Such was the principle recognized by Lord Stowell in the case of The Augusta, 1 Dod. 287. "It is quite clear," said the court, "that the bill of exchange was founded on considerations of personal responsibility only, and that a bond of hypothecation was not at that time in the contemplation either of the borrower or lender. I have therefore no hesitation in saying that with respect to the £600, the bond is not effective; but with respect to the other part of the money, I am of a different opinion. For it is evident that no other security was held out than the ship and the freight, and it is therefore so far indisputably, a bottomry transaction. The foreign merchant, it is true, wished to extend the same species of security to the whole of his debt, and I see nothing dishonest or dishonorable in his attempt to do so; but, at the same time, this court cannot lend its assistance by enforcing the bond beyond the extent of its legal validity. It cannot permit the party to say the master had no other resource for procuring supplies except bottomry, when he himself had been content to advance the money on the personal responsibility of the owner. As far, then as it relates to the £600, I think the bond is invalid; but for the rest, I think it ought to be enforced. It is not necessary here, that a bond should be either good or bad, in toto: in the equitable proceedings of this court, it may be good in part and bad in part." The case of The Hero, 2 Dod. 139, and that of The Hunter [Case No. 6,904], will be found to correspond with the one just cited, and the decisions of the courts are in strict conformity with the rules here laid down. It is true that in the case of The Hunter, Judge Ware held that although there was a fatal objection to the instrument as a bond securing marine interest, it was not perhaps quite certain that the creditor could have no remedy upon it in a court of admiralty for the principal sum advanced, with land interest. In that case an amendment to the libel was allowed, and upon a new allegation that the libelant had a right to be paid upon general principles of the maritime law, the amount which it was shown had been originally advanced up-

on the personal credit of the owner, was decreed to be paid with land interest only.

Without undertaking to question the correctness of the course adopted by the learned judge of the district court of Maine, in giving a remedy in rem for a sum which he previously declared had been advanced upon the personal credit of the owners, it will be sufficient to show that the case now under consideration differs materially from that in which the amendment was allowed. In the latter case, there was the usual assumption of maritime risks, whereas the libelants here, as we have already seen, expressly refused to take any such risks. The claim of the lenders should have been made to depend upon the safe arrival of the vessel. This was necessary to justify the court in granting them now a remedy in rem. It is perfectly true, as the proctor contends, that the very fact that advances had been made to defray the expenses of repairs, would create a lien upon the vessel, if such advances had been made upon the credit of the vessel, and that such a lien would exist if there were no special act of hypothecation or mortgage. It would indeed exist by operation of law. But if instead of relying upon the general principles of the maritime law, the lender of the money chooses to exact of the master a special hypothecation of the vessel and cargo, and causes to be inserted in the instrument, clauses which operate as a waiver of his lien, or as a forfeiture of his right to proceed in rem, how can a court of admiralty grant him relief? If, as in the case now under consideration, he exacts maritime interest upon his loan, and at the same time expressly refused to assume maritime risks, is it not clear that the very instrument upon which he relies for his security is, by the well recognized principles of the maritime law, an abandonment of all claim against the vessel? It is well settled that if a material man gives personal credit, even in the case of materials furnished to a foreign ship, he loses his lien so far as to exclude him from a suit in rem. Zane v. The President [Case No. 18,201]. This rule is doubtless subject to the qualification that an express contract for a stipulated sum is not of itself a waiver of the lien, unless the contract contains some stipulations inconsistent with the continuance of the lien. [Peyroux v. Howard] 7 Pet. [32 U. S.] 324. The drawing of the bill of exchange does not, in my judgment, help the case of the libelants. In the case of The Augusta, already referred to, Lord Stowell considered that the taking of a bill of exchange by the holder of a bottomry bond, was a strong circumstance to show that the advances were made on the personal credit of the owners, and not on the credit of the vessel, and he held the bond void for the amount of the bill, and good for the advances made after the bill was drawn. It is, however, the usual practice to draw bills of exchange; and there is no inconsistency in taking this collateral security, nor has it ever been held to exclude the bond, nor diminish its solidity. So it was distinctly held in the case of The Jane, 1 Dod. 466. But it is well settled, that when a bill is drawn, and a bottomry bond taken, with maritime interest, for the same sum, the bill must share the fate of the bond. Until the vessel arrives in safety at the end of the voyage, the loan is at the risk of the lender, and if she is lost, nothing is due upon the bill more than upon the bond. When a bill is therefore drawn, and a bottomry bond given for the same consideration, the owner is not bound to honor the bill; at least not before the safe arrival of the vessel and the end of the risk. For it does not appear that anything will ever be due until the happening of the event on which the bond becomes payable, and then the payment of one security extinguishes both. The Hunter [supra].

It is further contended by the proctor of the libelants, that it is altogether premature, upon a trial of this exception to the jurisdiction, to regard the interest charged by the lender as usurious; that it is competent for the party upon the trial of the case upon its merits, to show that under the charge of interest and commission, there is no usury; that the interest is one thing and the commission another, and that there is nothing to prevent the court from considering the one as separate and distinct from the other. When the question of jurisdiction was first presented to the consideration of the court, I certainly did not understand the proctor to deny that maritime interest had been charged in the bill of exchange and the instrument of hypothecation, and I cannot upon an examination of that instrument, resist the conclusion that usury lurks under this apparently harmless name of commission. The aggregate amount borrowed by the master was $813. This was loaned at the rate of what is specifically denominated six per cent. commission, and the advance and commission amount to $862. For this, a draft is drawn, payable one day after sight, on the owner, residing in the city of Philadelphia. Here, then, is the sum of $49 commission, charged upon a loan of $813 for the space of perhaps ten days—allowing this time for the bill to be sent to the residence of the owner, from Key West. To use the expressive language of Lord Stowell, in the case of The Gratitudine, 3 C. Rob. Adm. 277, "I know that the word commission sounds sweet in a merchant's ear; but whether it is a proper charge or not on this occasion, I will not take upon myself to determine without a reference to the registrar properly assisted." I entertain but little doubt that maritime interest has been stipulated to be paid, and I have as little doubt that it is fully within my power, sitting in a court of admiralty, to reduce the rate of interest, where it is manifestly exorbitant, that is to say, in a case coming within my jurisdiction. The power possessed

will, however, be exercised with great care and caution. The Zodiac, 1 Hagg. Adm. 326. But I do not pretend to assert the doctrine, that to justify this court, as a court of admiralty, to exercise jurisdiction over a bottomry transaction, it is indispensably necessary that maritime interest should be charged. This would, in my judgment, be altogether unreasonable. The lender of money on a bottomry bond certainly has a right to relinquish a portion of the profits he would be entitled to realize; and the owner of a vessel would come with a bad grace to contest the validity of a bottomry security, upon the ground that the lender of the money had charged the master less than he was authorized to exact under the maritime law.

Conceding then, that in the case before us, maritime interest was not demanded, and that the charges under the name of commissions will not amount to usury, can this court, as a court of admiralty, exercise jurisdiction of the case, when it is perfectly apparent that no maritime risks were incurred? I am clearly of opinion that it cannot. In the language of Sir Stephen Lushington, in the case of The Emancipation, 1 W. Rob. Adm. 128, "I must look to the bond itself, without referring to extrinsic evidence at all; and unless I can come to the conclusion, from the words of the bond, that any maritime risk is to be directly or indirectly inferred, I must hold that I have no authority to pronounce in favor of its validity." Again, that eminent civilian says, in the same opinion: "I am perfectly satisfied that whatever might have been the intention of the contracting parties to the bond, both upon the face of the bond itself, and according to legal inference, the payment of the money advanced does not depend upon the safe arrival of the ship. I must, therefore, pronounce against the bond."

Upon mature consideration, therefore, I am of opinion that, as the pleadings now stand, I have no jurisdiction of the case, and that the libel must be dismissed, with costs.